**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM, | |
| Plaintiff, | CIVIL ACTION NO.: 4:20-cv-246 |
| v. | |
| ITPEU HEALTH AND WELFARE PLAN, et al., | |
| Defendants. | |

**<u>O R D E R</u>**

Presently before the Court are Plaintiff University of North Carolina Health Care System's ("UNC Health") Motion for Judgment on the Administrative Record, (doc. 45); Defendants ITPEU Health and Welfare Plan, ITPEU Health and Welfare Fund, and Board of Trustees of the ITPEU Health and Welfare Fund's (collectively, "ITPEU Defendants") Motion for Judgment on the Administrative Record and for Summary Judgment, (doc. 47); and Defendants Anthem Insurance Companies, Inc. and Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.'s (collectively, "Anthem Defendants") Motion for Summary Judgment, (doc. 44).[1] UNC Health brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*, to recover payment for medical benefits incident to the hospitalization, care, and treatment of non-party Ronnie Taylor who was severely injured in an automobile accident in May 2017.  (Doc. 1.)  At the time of the accident, Mr. Taylor was a beneficiary of the ITPEU Health and Welfare Plan (the "Plan").  (Doc. 67, ¶ 32.)  UNC Health

---

[1] UNC Health also filed a Request for Oral Argument on the Parties' Dispositive Motions, which the Court **DENIES**.  (Doc. 70.)

billed the Plan for the costs of treating Mr. Taylor.  (Id. at ¶ 48.)  Although UNC Health's claims were initially approved and paid out, (see doc. 41-6, pp. 57–89; see also doc. 41-4, p. 409), Defendant Board of Trustees of the ITEPU Health and Welfare Fund (the "Board") directed its third-party claims administrator to halt payments, recoup prior payments, and deny future claims for Mr. Taylor's treatment costs based upon a provision of the Plan Document which excluded from coverage treatment for "injuries received while committing a crime," (see doc. 41-2, pp. 4–7).  After UNC Health tried (unsuccessfully) to appeal the Board's decision, it filed suit alleging, inter alia, that the Board and its claims administrator violated the terms of the Plan and abused their discretion when they terminated coverage for the claims and recouped prior payments. (Doc. 1.)  The Parties have filed the at-issue Motions.  (Docs. 44, 45, 47.)  The issues have been fully briefed.  (Id.; see also docs 60, 61, 62, 65, 66, 69.)  For the reasons stated below, the Court **GRANTS in part and DENIES as moot in part** the ITPEU Defendants' Motion, (doc. 47), and the Anthem Defendants' Motion, (doc. 44), and **DENIES** UNC Health's Motion, (doc. 45).

## BACKGROUND

### I.      The Parties

Plaintiff UNC Health is an integrated health care system owned by the State of North Carolina and established under North Carolina law.  (Doc. 1, p. 2; doc. 17, pp. 1–2); see N.C. Gen. Stat. § 116-37.  UNC Health encompasses, among other facilities, the University of North Carolina Hospitals at Chapel Hill ("UNC Hospitals").   (Doc. 1, p. 2; doc. 17, pp. 1–2.) Defendant ITPEU Health and Welfare Plan (the "Plan" or "Defendant Plan") is an ERISA-governed multiemployer employee welfare benefit plan which provides medical benefits to members of the Industrial, Technical and Professional Employees Union, AFL-CIO ("ITPEU"). (Doc. 68, ¶ 1.)  Defendant ITPEU Health and Welfare Fund (the "Fund" or "Defendant Fund") is

an ERISA-governed multiemployer employee welfare trust.  (Doc. 17, pp. 3–4; see doc. 41-1, p. 6.)  The Board administers the Fund in order to provide benefits to eligible Plan participants and beneficiaries.  (Doc. 17, pp. 3–4; doc. 61-1, ¶ 3.)   Defendant Anthem Insurance Companies, Inc. ("AICI") is an Indiana corporation and wholly owned subsidiary of Anthem, Inc., which, according to Anthem, Inc's 2020 10-K filed with the S.E.C., is "one of the largest health benefits companies in the United States."  (Doc. 59-1, pp. 5, 501; doc. 68, ¶ 3.)  Defendant Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. (frequently, "BCBSGA") is a third-party administrator for claims for medical benefits.  (See doc. 68, ¶ 4; see also doc. 41-1, pp. 137–56.) Both AICI and BCBSGA use the "doing business as" name "Anthem Blue Cross Blue Shield" ("Anthem BCBS").  (Doc. 68, ¶ 3; see doc. 59-1, p. 501.)  Anthem BCBS is also the trade name of Anthem Health Plans, Inc., an independent licensee of the Blue Cross and Blue Shield Association.  (Doc. 67, ¶ 17; see doc. 41-5, p. 2.)

## II.    Relevant Provisions of the Summary Plan Description, Plan Document, and Administrative Services Agreement

Benefits under the Plan are paid from the Fund's assets, which are accumulated from contributions made by employers in accordance with collective bargaining agreements.  (Doc. 67, ¶¶ 6–7; doc. 41-1, p. 6.)  According to Section 20 of the Plan Document, "[t]he Trustees shall have full authority and power, in their absolute discretion to determine . . . the construction of the provision of all Plan documents[,] . . . the nature and amount of all benefits to be provided under the Plan . . . [and] eligibility to receive benefits from the Plan."  (Doc. 41-1, pp. 10–11.) However, the Summary Plan Description ("SPD") that accompanies the Plan Document provides that, "[a]s an enhancement to the medical benefit program offered by the Plan, the Trustees have engaged Anthem Blue Cross Blue Shield (Anthem) as the Claims Administrator for all medical benefits claims."  (Id. at p. 6; see id. at p. 117.)  Indeed, on January 1, 2013, the Fund entered

into an "Administrative Services Agreement" ("ASA") with "Blue Cross and Blue Shield of Georgia, Inc. and [Defendant] Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. dba Anthem Blue Cross Blue Shield."  (Id. at p. 137.)  Article 3(b) of the ASA states that the Fund "has the discretionary authority and control over the management of the Plan, and all discretionary authority and responsibility for the administration of the Plan *except as delegated to [the claims administrator] in Article 2(c) of [the ASA]*."  (Id. at p. 143 (emphasis added).) Article 2(c) of the ASA, in turn, "delegates to [the claims administrator] fiduciary authority to determine claims for benefits under the Plan."  (Id. at pp. 140.)  Article 2(c) also states that the claims administrator "is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan."  (Id.)  Furthermore, Article 2(b) states that the claims administrator shall perform various claims administrative services, including "[p]rovid[ing] notice in writing when a [c]laim for benefits has been denied."  (Id. at pp. 139–40.)

The Plan Document provides two separate "claims review and appeal procedures": one for "claims for medical benefits," which is set forth in Section 18, and another for all claims "other than medical benefits," which is described in Section 19.  (Doc. 41-1, pp. 116–125; see also id. at pp. 61–68.)  Section 18 states that "all claims for medical benefits and appeals from denials of such claims shall be handled exclusively by the Claims Administrator (Anthem)." (Doc. 41-1, p. 117.)  Section 18 further provides that appeals from an "adverse benefit determination," which includes a "claim denial or rescission of coverage," must be filed by a participant or their "authorized representative" within 180 calendar days after notice of the denial or recission.  (Id. at p. 119.)  Under Section 19, all non-medical benefits claims are handled by the "Plan Office," and appeals from the denial therefrom are decided by a "Committee designated by the Board."  (Id. at pp. 123–124.)  Section 19 permits a participant or their

4

"representative" to file an appeal within 180 days of receiving notice that their claim was denied. (Id. at p. 124.)

The Plan's medical program "covers reasonable and necessary medical expenses," but does not apply to "any medical expenses specifically excluded from coverage." (Id. at p. 90.) Section 24 of the Plan, titled "General Exclusions and Limitations," excludes from coverage, among other things, "[i]njuries received while committing a crime" (the "Crime Exclusion"). (Id. at p. 134.)  Furthermore, Section 26 of the Plan Document states that "[a]ll [m]edical . . . benefits payable by the Fund shall be deemed assigned to the Health Care . . . Provider in question by the affected Participant." (Id. at p. 136.)  Finally, Section 21 of the Plan Document permits the Fund to recover excess payments made under the Plan from "[a]ny person to whom, or for whom, the benefits were paid." (Id. at p. 127.)

### III.    Ronnie Taylor's Motor-Vehicle Accidents and Hospitalization

According to a police report ("Police Report 1"), at approximately 10:45 pm on May 18, 2017, (id. at p. 290), Mr. Taylor was driving in Fayetteville, North Carolina, when he collided with five different vehicles.  (Id. at pp. 264–68.)  Specifically, Mr. Taylor collided with a parked car off the roadway on the sidewalk, collided head-on with a second car, side-swiped a third car, collided head-on with a fourth vehicle, and then sideswiped a fifth vehicle.  (Id. at pp. 265–70.) A box labeled "hit & run" located next to a description of Mr. Taylor's vehicle is checked.  (Id. at p. 264.)  Mr. Taylor's vehicle is listed as the at-fault vehicle for the multi-car collision.  (Id. at p. 268.)   A separate police report ("Police Report 2") states that, after these collisions, Mr. Taylor continued driving until he hit a curb, drove off the roadway, struck a guy wire, and collided with a storage shed in the back yard of a private residence.  (Id. at p. 262.)  At that point,

a fire engulfed Mr. Taylor's vehicle while he was inside, resulting in serious burns to his body. (Id.)

Police Report 2 states that EMS transferred Mr. Taylor to Cape Fear Valley Medical Center, where, more than an hour after the crash, his blood was drawn and determined to have an alcohol concentration of .18.  (Id. at pp. 261–62.)  Shortly thereafter, Mr. Taylor was transferred by helicopter to the emergency department at UNC Hospitals.  (Doc. 68, ¶ 15; doc. 41-2, pp. 67–68.)  Mr. Taylor remained at UNC Hospitals for treatment from May 19, 2017, until January 19, 2019.  (Doc. 68, ¶ 17.)  UNC Hospitals' doctors diagnosed Mr. Taylor's burns as covering between 60–69% of the surface of his body, with between 30–39% qualifying as third-degree burns.  (Doc. 68, ¶ 18.)   In addition to performing other surgeries, UNC Hospitals' physicians amputated one of Mr. Taylor's toes and portions of both of his arms.  (Id.)

## IV.   Issues Concerning the Parties' Statements of Undisputed Material Fact

Before setting forth the remaining undisputed material facts involved in this case, the Court must address certain issues raised by the Parties' statements of undisputed material fact ("SUMF").  Pursuant to Southern District of Georgia Local Rule 56.1 ("L.R. 56.1"), Defendants filed SUMFs in addition to their respective Motions for Summary Judgment.[2]  (Doc. 46 ("Anthem Defendants' SUMF"); doc. 48 ("ITPEU Defendants' SUMF").)  UNC Health filed a "Statement of Undisputed Material Facts in Opposition to Defendants' Motions for Summary Judgment" ("UNC Health's SUMF") in conjunction with its Motion for Judgment on the Administrative Record.  (Doc. 59.)  The parties filed responses to each other's SUMFs, (docs.

---

[2]  L.R. 56.1 requires a party who files a motion for summary judgment to "annex[] to the motion a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof."  S.D. Ga. L.R. 56.1.

60-1, 61-1, 68), and the ITPEU Defendants filed a reply to UNC Health's response to their SUMF, (doc. 67).

### A.      Defendants' Objections to UNC Health's SUMF

The ITPEU Defendants argue that UNC Health's SUMF violates L.R. 56.1 because UNC Health filed "*one collective* SUMF to address *two* separate briefings": (1) the Anthem Defendants' Motion and (2) the ITPEU Defendants' Motion.  (Doc. 68, pp. 1–2.)  The Court disagrees.  The issue raised by the ITPEU Defendants relates to the fact that the title of UNC Health's own SUMF indicates that it is filed "in Opposition to Defendants' Motions for Summary Judgment."  (Doc. 59, p. 1.)  However, L.R. 56.1 does not require a SUMF to be titled in any particular manner; rather, it merely provides that, in moving for summary judgment, a party must submit, "in addition to the brief, . . . a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law," and that, in opposing a motion filed by another party, a party must controvert—in a "statement"—the material facts set forth in the statement filed by the other party.  S.D. Ga. L.R. 56.1.  UNC Health satisfied both of these requirements because it (1) filed a (albeit confusingly named) SUMF setting forth the material facts it contends are not in dispute, (doc. 59), and (2) filed individual responses to the ITPEU Defendants' and the Anthem Defendants' respective SUMFs purporting to controvert their asserted facts, (docs. 60-1, 61-1).

Defendants also argue that numerous matters set forth in UNC Health's SUMF violate L.R. 56.1 because "UNC [Health] only cites to the [Verified] Complaint[,] . . . [which] is not part of the administrative record."[3]  (See, e.g., doc. 68, ¶¶ 80, 125, 128.)  Defendants also object to certain fact statements for "contain[ing] multiple facts."  (See, e.g., id. at ¶¶ 13–14, 44.)  Again,

---

[3]  The parties jointly filed the administrative record shortly before filing the at-issue Motions.  (Docs. 40, 40-1, 40-2, 40-3, 40-4, 40-4, 40-6.)

the Court is not persuaded by either argument.  L.R. 56.1 states that "[e]ach statement of material fact shall be supported by a citation to the *record*;" it neither explicitly requires citation to the *administrative* record nor prohibits a party from including multiple facts in a given paragraph. S.D. Ga. L.R. 56.1 (emphasis added).  Furthermore, unlike the United States District Court for the Northern District of Georgia's analogous local rule, L.R. 56.1 does not explicitly prohibit a party from supporting a fact by citing to pleading.  Compare id., with N.D. Ga. L.R. 56.1(B)(1) (stating that the Court will not consider any fact "supported by a citation to a pleading rather than to evidence").  Defendants do not argue that UNC Health's Verified Complaint is not part of the record in this case, nor do they point to any authority establishing that using a verified complaint as supporting evidence automatically violates L.R. 56.1.  Furthermore, UNC Health filed a *Verified* Complaint, which is the equivalent of an affidavit for purposes of summary judgment. Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing with approval Barker v. Norman, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981), in which the Fifth Circuit Court of Appeals stated that a properly verified complaint is the equivalent of an affidavit for purposes of summary judgment).  Indeed, even the Northern District of Georgia has held that citing to a verified complaint is not "so egregious or such a burden on the court as to warrant" disregarding a SUMF because a verified complaint is akin to a sworn affidavit.  Sibley v. Nat'l City Mortg. Co., No. 1:12-CV-00305-SCJ-JFK, 2013 WL 12097954, at *3 n.4 (N.D. Ga. July 24, 2013) (quotations omitted).  Thus, the Court declines to disregard the facts in UNC Health's SUMF containing these purported improprieties.

**B.  UNC Health's Objections Concerning the Identity of the Plan's Third-Party Claims Administrator and Use of the Term "BCBSGA"**

In its Response to the ITPEU Defendants' SUMF, UNC Health objected to statement of fact sixteen, which states that "BCBSGA is the third-party claims administrator for medical

benefits for the Plan." (Doc. 60-1, ¶ 16.)  According to UNC Health, this fact is contradicted by the SPD, which states that "the Trustees have engaged *Anthem Blue Cross Blue Shield (Anthem)* as the Claims Administrator for all medical benefits claims." (Id. (citing doc. 41-1, p. 6) (emphasis added).)  Additionally, UNC Health contends:

> [T]o the extent [the] ITPEU Defendants are using the term "BCBSGA" as defined in the ITPEU [Defendants'] SUMF Paragraph 15 as "Blue Cross Blue Shield of Georgia, Inc.", it is inaccurate.  With respect to administration of medical benefit claims and appeals, Section 18.01 of the Plan [Document] grants authority exclusively to Anthem BCBS as the Claims Administrator: ". . . [A]ll claims for medical benefits and appeals from denials of such claims shall be handled exclusively by the Claims Administrator (Anthem)."  Additionally, the applicable [ASA] defines "BCBSGa" as "Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. dba Anthem [BCBS]."

(Id. at p. 5 (administrative record citations omitted).)  UNC Health repeated this latter objection in response to practically every statement of fact which included the term "BCBSGA." (See generally doc. 60-1; see also doc. 61-1 (objecting in nearly identical fashion to the facts concerning BCBSGA set forth in Anthem Defendants' SUMF).)  In fact, UNC Health stated this objection dozens of times, and, in many instances, did not object to the asserted statement of fact on any other basis.

In the ITPEU Defendants' Reply to UNC Health's Response to their SUMF, the ITPEU Defendants argue that the matters to which UNC Health objected on these bases should be deemed admitted because, *inter alia*, (1) the provisions of the Plan Document and the ASA cited by UNC Health "confirm[] that BCBSGA is the claims administrator for medical benefits for the Plan" and (2) UNC Health fails to "point to any evidence in the Administrative Record that controverts" the fact at issue.[4]  (Doc. 67, ¶ 16; see generally doc. 67 (incorporating this argument

---

[4]  L.R. 56.1 provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless controverted by a statement served by the opposing party*." S.D. Ga. L.R. 56.1 (emphasis added).  Additionally, Federal Rule of Civil Procedure 56(c) provides, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must

by reference throughout their Reply to UNC Health's Response to their SUMF).)   The Court agrees that the sources cited by UNC Health clearly show that Defendant BCBSGA administers medical benefits claims for the Plan.  As UNC Health acknowledges, BCBSGA is a signatory to the ASA, which delegates "full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan" to BCBSGA.  (Doc. 41-1, p. 140.)  Furthermore, the Plan Document explicitly states that "Anthem BCBS"—the name under which, according to the Verified Complaint, Defendant BCBSGA does business—is the "Claims Administrator."  (Id. at p. 6; see doc. 1, pp. 1–2.)   Indeed, UNC Health concedes in its Response to the Anthem Defendants' Motion that Defendant BCBSGA does business as Anthem BCBS.  (Doc. 61, p. 2.) Additionally, UNC Health has not pointed to any evidence suggesting that Defendant BCBSGA does *not* administer claims for medical benefits on behalf of the Plan.  Thus, UNC Health has failed to effectively controvert (as required by L.R. 56.1 and Rule 56(c)) the asserted fact that Defendant BCBSGA administers claims on behalf of the Plan.

Based on the forgoing, the Court finds that UNC Health's numerous objections to Defendants' use of the term "BCBSGA" when referring to the Plan's claims administrator are insufficient under L.R. 56.1 and Federal Rule of Civil Procedure 56(c).  As such, the broader factual assertions contained within the statements of fact to which UNC Health objected on this basis alone may be deemed admitted or undisputed.  Notwithstanding, "the Court still must determine whether there is sufficient record support for [the ITPEU Defendants'] version of the facts and whether a genuine issue of material fact precludes the entry of summary judgment in [their] favor."  Am. Serv. Ins. Co. v. Webber's Transp., LLC, No. 4:20-cv-013, 2022 WL 3702059, at *3 (S.D. Ga. Aug. 26, 2022).  "[S]tatements of fact may be deemed true only so far

---

support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).

as they are supported by the evidentiary materials." Osborn v. Whites & Assocs. Inc., No. 1:20-cv-02528-TWT-AJB, 2021 WL 6113656, at *2 n.3 (N.D. Ga. Nov. 16, 2021), *report and recommendation adopted*, No. 1:20-cv-2528-TWT, 2021 WL 6113625 (N.D. Ga. Dec. 3, 2021). Indeed, the Court only "deems facts admitted where [the movant] provides sufficient evidentiary support for [its] assertion, and [the opposing party] fail[s] to provide controverting evidence to support disputing the assertion." Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr., No. 18-CV-25099-MORENO/STRAUSS, 2021 WL 7368630, at *2 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, No. 18-25099-CIV-MORENO, 2022 WL 354241 (S.D. Fla. Feb. 7, 2022). Accordingly, the Court will review Defendants' citations to the record in support of the statements of fact to which UNC Health insufficiently objected in order to determine if there is, indeed, no genuine issue of material fact with respect thereto. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

## V. UNC Health's Claims for the Costs of Treating Mr. Taylor, Payment of Claims, and the Board's Request to Recoup Payments

Mr. Taylor was enrolled as a beneficiary under the Plan through his wife, Lavonne Taylor, from the time of his admission to UNC Hospitals until August 31, 2017, and again from October 17, 2017, through September 30, 2018. (Doc. 67, ¶ 32; doc. 41-2, p. 28.) In March 2018, UNC Health interim-billed the Plan for the costs of hospitalizing, treating, and caring for Mr. Taylor during the periods he was a beneficiary. (Doc. 67, ¶ 48.) According to three statements titled "Explanation of Benefit Payments", Anthem BCBS released approximately $3.6 million of "allowable charges" (i.e., the at-issue claim) related to Mr. Taylor's hospital stay to UNC Health in July 2018. (See doc. 41-6, pp. 57–89; see also doc. 41-4, p. 409.) On July 12, 2018, Heather Butts, a senior account manager at Anthem Inc., sent an email to the Fund Administrator, stating, "[A] high dollar claim will hit your invoice next week. This is an

inpatient stay due to a car accident and injuries sustained due to the accident.   Allowed: $3,656,863.74." (Doc. 41-2, p. 165.)   According to a separate e-mail sent by Camille Robinson, an account executive for Anthem, Inc., "[s]ubrogation . . . was engaged to obtain additional details" concerning the claim.   (Id. at pp. 9–10; see also doc. 41-3, p. 15.)   After the Fund's Actuarial Consultant requested additional information on "what's happening" with the claim, Butts informed him that "[s]ubrogation . . . spoke to outside counsel," who "noticed the exclusion in the SPD [for] injuries while committing a crime" and "suggested talking to [the Fund's] legal [team] as well on how [the Fund] might want to proceed." (Doc. 41-2, p. 176.) Butts supplied him with copies of the police reports from Mr. Taylor's accident. (Id. at p. 177.)

On July 23, 2018, members of the Board met telephonically to deliberate about how to proceed.   (Doc. 41-1, pp. 285–86.)   In an e-mail memorializing the meeting, Susan Murray, counsel for the Fund, stated that the Fund "should never ha[ve] paid any of [Taylor's] bills due to the [Plan's] exclusion of 'injuries received while committing a crime.'"   (Id. at p. 286.) Accordingly, Murray proposed "immediately notify[ing] Anthem that any claims associated with th[e] incident of May 18, 2017[,] be denied due to the above exclusion from coverage" and instructing it "to recoup any claims that have been paid associated with this incident."   (Id.) Three members of the Board consented to the proposal via e-mail, (id. at p. 285), and, on July 24, 2018, Murray sent a letter to Butts requesting that Anthem pursue reimbursement for the benefits previously paid to UNC Health for the costs of treating Mr. Taylor, (doc. 68, ¶ 45; doc. 41-1, pp. 287–88).   According to the letter, the Fund determined, based upon the police report, that UNC Health's claim fell within the SPD's Crime Exclusion because the police reports showed that Mr. Taylor was driving while impaired and fleeing the scene of an accident when he received his injuries.   (Doc. 41-1, pp. 287–88.)   Furthermore, in the letter, Murray stated that she had already

"instructed the [Fund] Administrator. . . not to pay any further claims . . . associated with the accident." (Id.)

According to a timeline produced by Robinson (the account executive for Anthem, Inc.), on July 24, 2018, "Anthem initiated [the] recovery process" and instituted a "claim stop . . . to prevent future claims from paying." (Doc. 41-2, p. 19; see id. at p. 7.)  The parties agree that, at some point in 2018, Anthem BCBS—through BlueCross BlueShield of North Carolina ("BCBSNC")—recouped the payments made to UNC Health for Mr. Taylor's treatment.  (Doc. 68, ¶ 62.)  On July 30, 2018, Murray (counsel for the Fund) sent a letter to Mr. Taylor via first class, certified mail, return receipt requested, informing him that his injuries fell within the Crime Exclusion, and, therefore, were not covered under the Plan ("the Claim Denial Letter"). (Doc. 41-2, pp. 4–6.)  Specifically, the Claim Denial letter stated that the police reports from the day of Mr. Taylor's accidents indicate that he received his injuries while driving impaired and fleeing the scene of an accident in violation of N.C. Gen. Stat. §§ 20-138.1 and 20-166, respectively.  (Id. at pp. 4–5.)  The Claim Denial Letter informed Mr. Taylor that he, his representative, or his spouse, "as the participant, has the right to appeal this decision within one hundred and eighty . . . days" of receiving that Letter.  (Id. at p. 5.)  The Claim Denial Letter further stated that "[t]he designated Claims Appeal Committee of the Board . . . will hear the appeal within sixty . . . days of the submission and will send you a written decision."  (Id.) Attached to the Claim Denial Letter was a copy of Section 19 of the Plan Document, which outlines the procedures for appealing denials of claims other than medical benefits.  (Id. at p. 6; see doc. 41-1, pp. 123–24.)  On November 9, 2018, a BCBSNC representative e-mailed UNC Health confirming that the funds had been recouped pursuant to a "provision of the insurance

contract[,] [whereby] the [Plan] elects not to pay for any service that is rendered to any of its participants that have sustain[ed] injuries during a commission of a crime." (Doc. 41-2, p. 74.)

**VI.    Requests for Documents, UNC Health's Appeal, and Anthem BCBS's Denial of the Appeal**

On January 14, 2019, Peter Varney, UNC Health's Associate General Counsel, sent a letter to Anthem BCBS requesting copies of all documents, records, and information relevant to UNC Health's claims for treating Mr. Taylor pursuant to 29 C.F.R. § 2560.503-1(h).[5]  (Doc. 41-3, p. 94.)  On February 14, 2019, Varney sent another letter to Anthem BCBS complaining that he had not received a reply and demanding that Anthem BCBS produce the requested documents by February 22, 2019.  (Id. at pp. 91–93.)  Furthermore, the letter states that UNC Health intends to seek review of the denial of its claims and that Mr. Taylor "authorized [UNC Health] to serve as his representative with regard to pursuing medical benefit claims and appeals arising out of his care and treatment."  (Id. at pp. 91–92.)  Attached to the letter is a document (the "PHI Form") signed by Mr. Taylor on January 18, 2019, which states, "I authorize [BCBSNC] . . . to release any of my protected health information (PHI) to my representative named above for purpose of resolving my appeal."  (Id. at p. 93.)  The PHI Form also states, "I have given my permission for Ronnie Taylor [sic] to represent me, and act on my behalf regarding the . . . denial for the following services: [May 19, 2017] coverage term date."  (Id.)

On March 12, 2019, Anthem BCBS sent Mr. Taylor a letter indicating that it had received a "request for an appeal" on February 14, 2019, but that it could not begin reviewing the request until Mr. Taylor authorized UNC Health to pursue an appeal on his behalf.  (Id. at p. 84.)  The letter stated that "the information provided in the authorization you supplied is insufficient,"

---

[5]  29 C.F.R. § 2560.503-1(h) is a federal regulation providing the procedures for appealing adverse benefit determinations by ERISA-governed Plans.

(id.), and it attached a "Designation of Representative / Authorization Form" ("DOR form") for Mr. Taylor to complete and return to Anthem BCBS, (id. at pp. 85–88).

On May 10, 2019, Varney formally requested an appeal of "the adverse benefit determinations on the previously approved Claims, recoupment of benefits payments, and denial of further medical benefits arising out of the Claims" (the "Appeal Letter"). (Id. at p. 23; see id. at pp. 23–35; doc. 61-1, ¶ 34.) In the Appeal Letter, Varney demanded reimbursement of the confiscated amounts and reinstatement of approval of all Claims. (Doc. 68, ¶116; doc. 41-3, p. 23.)

On July 11, 2019, Anthem BCBS sent Mr. Taylor another letter (along with another blank DOR form), acknowledging receipt of Varney's request for an appeal, but stating that he needed to fill out the DOR form if he wanted Varney to pursue an appeal on his behalf. (Doc. 41-4, pp. 510–14.) Like the February 14, 2019, letter, this letter warned that the information "provided in the authorization form [previously] supplied is not sufficient." (Id. at p. 510; see doc. 41-3, p. 84.) On August 9, 2019, Varney sent a letter to Anthem BCBS contending that UNC Health was authorized under Section 26 of the Plan to pursue the appeal without having Mr. Taylor fill out a separate authorization form and demanding that Anthem BCBS review the appeal. (Doc. 41-2, pp. 116–19.) Nonetheless, Varney attached (1) a copy of a "general consent to treatment" executed by Mr. Taylor's wife in connection with his hospitalization and (2) the January 18, 2019, PHI Form (which authorized the release of protected health information). (Doc. 67, ¶ 88; see doc. 41-2, p. 119; see also doc. 41-5, pp. 311–13.) Subsequently, on August 30, 2019, Varney sent a letter to Anthem BCBS attaching a completed DOR form and demanding that it process the appeal immediately. (Doc. 41-2, pp. 142–46.)

On March 23, 2020, Anthem BCBS sent a letter to Varney denying UNC Health's appeal on the ground that the claims were barred by the Crime Exclusion.  (Doc. 41-4, pp. 433–36.)

## VII.    Procedural History

On October 8, 2020, UNC Health filed this suit asserting four counts against Defendants. (Doc. 1.)  In Count I, UNC Health requests a declaration that its claims were covered under the Plan.  (Id. at p. 24.)  It alleges in this count that the Board violated ERISA and the Plan's terms when it "improperly exercised authority over the Claims, reversed Anthem BCBS's approval of the Claims, terminated future coverage of the claims, and recouped the benefit payments from UNC Health."  (Id. at pp. 23–24.)  UNC Health also alleges that its appeal should be "deemed denied without the exercise of discretion by Anthem BCBS" because "Anthem BCBS consistently ignored UNC Health's appeal, failed to resolve the appeal timely, and disregarded the . . . claim and appeal regulations applicable to medical claims."  (Id. at p. 24.)  In Count II, UNC Health asserts a claim to recover benefits under 29 U.S.C. § 1132(a)(1)(B) ("Section 502(a)(1)(B)"), alleging, inter alia, that it is "entitled to payment of benefits incident to [Mr.] Taylor's hospitalization, care, and treatment."  (Id. at pp. 24–25.)  In Count III, UNC Health asserts that its internal appeal should be deemed "denied without the exercise of discretion by Anthem BCBS" because Anthem BCBS and the Board (1) "failed to resolve timely UNC Health's appeal" in violation of ERISA's "full and fair review" provision, 29 U.S.C. § 1133(2), and (2) violated other ERISA claims procedure regulations.[6]  (Id. at pp. 25–27.)  Count IV alleges that UNC Health is entitled to attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) because the Board and Anthem BCBS engaged in bad faith in denying the Claims and failed to

---

[6]  UNC Health concedes that Count III does not request monetary or other specific relief, but, rather, merely seeks a determination that Defendants mishandled the appeal and that UNC Health is therefore entitled to a more favorable standard of review of the 502(a)(1)(B) claim asserted in Count II.  (Doc. 60, p. 18.)

resolve UNC Health's appeal properly and timely.  (Id. at pp. 27–28.)  In its prayer for relief,

UNC Health requests the following: (1) a declaration that Mr. Taylor's hospitalization, care, and

treatment at UNC Hospitals were covered under the terms of the Plan; (2) an award of the

amount Anthem BCBS recouped from UNC Health for Mr. Taylor's care and treatment, plus

pre- and post-judgment interest; and (3) reasonable costs and expenses, including reasonable

attorneys' fees.  (Id. at p. 28.)

The parties' at-issue Motions, (docs. 44, 45, 47), have been fully briefed and are ripe for

review.

## DISCUSSION

### I.      UNC Health's Section 502(a)(1)(B) Claim

At the heart of UNC Health's case is its claim, pursuant to Section 502(a)(1)(B), for the

recovery of the benefits paid incident to Mr. Taylor's hospitalization, care, and treatment, which

were recouped from it in 2018.  (Doc. 1, pp. 24–25 (Count II).)  Section 502(a)(1)(B) authorizes

a "participant" or "beneficiary" of an ERISA plan to sue in federal court to recover benefits due

to him under the terms of a plan.  29 U.S.C. § 1132(a)(1)(B); see also 29 U.S.C. § 1002(8)

(defining "beneficiary" to include "a person designated by a participant, or by the terms of an

employee benefit plan, who is or may become entitled to a benefit thereunder").

The Parties have filed cross motions for summary judgment on this claim.  Summary

judgment in an ERISA case differs somewhat from summary judgment review in other cases.

Ruple v. Hartford Life & Accident Ins. Co., 340 F. App'x 604, 610 (11th Cir. 2009) (per

curiam).  Unlike summary judgment typically, in an ERISA benefits denial case the court "does

not take evidence, but, rather, evaluates the reasonableness of an administrative determination in

light of the record compiled before the plan fiduciary."  Prelutsky v. Greater Ga. Life Ins. Co.,

692 F. App'x 969, 972 n.4 (11th Cir. 2017) (per curiam) (quoting <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 17–18 (1st Cir. 2002)).  ERISA does not explicitly provide a standard for reviewing actions challenging benefits decisions by plan administrators or fiduciaries.  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 (1989).  The Supreme Court of the United States has held that a denial of benefits challenged under Section 502(a)(1)(B) is reviewed *de novo*, unless the plan bestows discretionary authority on the plan administrator to determine eligibility for benefits or to construe the terms of the plan.  <u>Id.</u> at p. 115.  When the plan administrator has such discretionary authority to review claims, the Court reviews its interpretation of the plan and factual determinations incident to its decision using an "arbitrary and capricious" standard of review.[7]  <u>Cagle v. Bruner</u>, 112 F.3d 1510, 1516 (11th Cir. 1997).  In <u>Blankenship v. Metro Life Ins. Co.</u>, 644 F.3d 1350, 1355 (11th Cir. 2011), the Eleventh Circuit outlined a six-part test for reviewing a plan administrator's benefits decision:

(1)  Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)  If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

---

[7]  The Eleventh Circuit uses the terms "arbitrary and capricious" and "abuse of discretion" interchangeably in this context.  <u>Doyle v. Liberty Life Assurance. Co. of Boston</u>, 542 F.3d 1352, 1355 n.1 (11th Cir. 2008).

(6)     If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Stewart v. Hartford Life and Accident Ins. Co., 43 F.4th 1251, 1254 (11th Cir. 2022) (citing Blankenship, 644 F.3d at 1355)).

Additionally, a plaintiff seeking to recover benefits under Section 502(a) must exhaust available internal administrative remedies under the plan before suing in federal court, unless doing so would be futile or the remedy is inadequate. Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan, 833 F.3d 1299, 1313–14 (11th Cir. 2016); Springer v. Wal-Mart Assocs.' Grp. Health Plan, 908 F.2d 897, 899 (11th Cir. 1990). Indeed, summary judgment is appropriate where a plaintiff fails to establish that it exhausted available internal remedies and fails to show that an exception or waiver applies. See, e.g., Bojorquez v. E.F. Johnson Co., 315 F. Supp. 2d 1368, 1376 (S.D. Fla. 2004) (granting summary judgment in favor of defendant on denial of benefits claim because plaintiff "failed to justify or excuse his failure to exhaust his administrative remedies prior to filing this suit").

That being said, a claimant may be deemed to have exhausted internal administrative remedies if the administrator failed to follow certain claims procedures or to provide a "full and fair" review of an appeal of an adverse benefits determination. See 29 C.F.R. § 2590.715-2719(F)(1); 29 C.F.R. § 2560.503–1(l). In such circumstances, if a claimant chooses to sue under Section 502(a) of ERISA, the claim is "deemed denied on review without the exercise of discretion by an appropriate fiduciary." 29 C.F.R. § 2590.715-2719(F)(1). The Eleventh Circuit has not definitively ruled on the appropriate standard of review for a "deemed" denial, see White v. Coca-Cola Co., 542 F.3d 848, 855–56 (11th Cir. 2008), nor has it addressed the "effect of substantial noncompliance with ERISA procedural regulations on the deference owed to a plan

administrator's adverse benefits determination," <u>O.D. v. Jones Lang Lasalle Med. PPO Plus Plan</u>, 772 F. App'x 800, 805 (11th Cir. 2019).   Numerous courts have held that *de novo*—rather than arbitrary and capricious—review applies.   <u>See, e.g.</u>, <u>Stewart v. Hartford Life & Accident Ins. Co</u>, No. 2:17-CV-01423-KOB, 2021 WL 1816961, at *14 (N.D. Ala. May 6, 2021) (collecting cases); <u>Stefansson v. Equitable Life Assurance Soc'y of U.S.</u>, No. 5:04CV40(DF), 2005 WL 2277486, at *11–12 (M.D. Ga. Sept. 19, 2005) (collecting cases).   Others, however, have held that "insubstantial procedural errors do not decrease the deference owed to ERISA plan administrators." <u>O.D.</u>, 772 F. App'x at 805 (collecting cases).

Here, Defendants argue that summary judgment is warranted on UNC Health's Section 502(a)(1)(B) claim because (1) UNC Health failed to exhaust the Plan's internal administrative remedies by filing a timely, authorized appeal,[8] (2) the Plan's decision to deny UNC Health's claim and to instruct Anthem BCBS to recoup prior payments was correct because UNC Health's claim was barred under the Crime Exclusion, and (3) the Board acted reasonably—i.e., not

---

[8]   Defendants also asserted—and UNC Health denied—that UNC Health lacks standing (or, put more accurately, does not have "a cause of action under the statute," <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 128 n.4 (2014)), to bring a Section 502(a)(1)(B) claim.   However, Defendants did not make this argument in their initial briefs, (<u>see generally</u> docs. 44, 47), but only in reply, (<u>see</u> doc. 66, pp. 15–18; doc. 65, p. 8, n.8).   "Arguments raised for the first time in a reply brief are not before a reviewing court." <u>Herring v. Sec'y, Dep't of Corr.</u>, 397 F.3d 1338, 1342 (11th Cir. 2005); see <u>Evans v. Berryhill</u>, No. 3:15-cv-096, 2017 WL 989274, at *6 (S.D. Ga. Feb. 21, 2017), *report and recommendation adopted*, No. 3:15-cv-096, 2017 WL 986355 (S.D. Ga. Mar. 14, 2017) (collecting cases).   Thus, Defendants' failure to raise these arguments in their initial briefing on their respective Motions "has resulted in their waiver[,] and the Court will not consider them." <u>Id.</u>; see <u>Access Now, Inc. v. Sw. Airlines</u>, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").   The Court notes that waiver of these arguments is unproblematic because, unlike the issue of constitutional standing, which cannot be waived, whether UNC Health possesses a cause of action under ERISA "does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case." <u>Lexmark</u>, 572 U.S. at 118 n.4 (quoting <u>Verizon Md. Inc. v. Public Serv. Comm'n of Md.</u>, 535 U.S. 635, 642–643 (2002)).

arbitrarily and capriciously—even if it improperly applied the Crime Exclusion.[9]  (See doc. 47, pp. 11–24; doc. 66, pp. 2–18; see also doc. 44, p. 1 n.1 (incorporating the arguments set forth in the ITPEU Defendants' Motion).)  UNC Health, for its part, contends that it is entitled to summary judgment on Count II because the Board's decision to deny its claim was "*de novo* wrong" (and arbitrary and capricious).  (Doc. 45, pp. 14–17, 25–31; doc. 69, pp. 11–15.)  UNC Health also argues that Defendants' decision to deny its claim should not be afforded any discretion or deference because Defendants failed to provide a "full and fair review" of its appeal and violated various other ERISA claims procedure regulations.  (Doc. 45, pp. 18-24.) According to UNC Health, the "many flaws in the process . . . entitle UNC [Health] to have exhausted the process, or for th[e] Court to invoke *de novo* review."  (Doc. 60, p. 18 (internal quotations omitted).)  In turn, Defendants argue that, to the extent Anthem BCBS violated any ERISA regulations when adjudicating UNC Health's appeal (which it denies), the Board's decision is entitled to deference under the substantial compliance doctrine.  (Doc. 62, pp. 25–30; doc. 44, pp. 10–11, n. 3.)  Finally, Defendants maintain that the Board's decision was correct under any standard of review.  (Doc. 47, pp. 15–24; doc. 66, pp. 2–13.)

## A.      Exhaustion of Administrative Remedies

The Court first addresses Defendants' arguments that Count II is barred because UNC Health failed to exhaust administrative remedies.  Specifically, Defendants argue that (1) UNC Health's May 10, 2019, Appeal Letter was untimely and (2) UNC Health did not have the authority to file an appeal until August 3, 2019—three months after it filed its appeal—when it

---

[9]  The Anthem Defendants also request summary judgment on the ground that AICI is not a proper defendant.  (Doc. 44, pp. 8–9; see doc. 65, pp. 3–5.)  According to the Anthem Defendants, AICI "had no involvement with the Plan or the underlying facts" or the "matters at issue in this case, including the coverage and appeal determinations."  (Doc. 44, p. 8.)  The Court need not address this argument because it ultimately finds, upon *de novo* review of the Board's decision, that UNC Health's claim was barred under the Crime Exclusion and that it is not entitled to any of its requested relief.  See Discussion Section I.B., infra.

sent Anthem BCBS an executed DOR form authorizing UNC Health to pursue an appeal on Mr. Taylor's behalf.  (Doc. 47, pp. 11–14.)  UNC Health, on the other hand, argues that it "timely and completely exhausted the available administrative procedures on behalf of . . . [Mr.] Taylor." (Doc. 60, p. 12; see id. at pp. 12–17.)

Even assuming that UNC Health's appeal was technically filed late, Anthem BCBS adjudicated the appeal anyway, without ever asserting that UNC Health's appeal was untimely. Thus, the purpose of the exhaustion requirement has been met.  Springer, 908 F.2d at 900 ("The very premise of the exhaustion requirement . . . is that the right to seek federal court review matures only after" a denial of claims has been reviewed by the appropriate fiduciary.).  Indeed, this case is distinguishable from others where courts applied the exhaustion requirement to bar suits by plaintiffs who filed suit to recover benefits without having first brought an internal appeal.  Cf. Bickley v. Caremark, 461 F.3d 1325, 1328–30 (11th Cir. 2006); Ivey v. Pearce, No. 1:08–cv–1840–WSD, 2008 WL 4613646, at *5 (N.D. Ga. Oct. 15, 2008); Spivey v. S. Co., 427 F. Supp. 2d 1144, 1149, 1154–56 (N.D. Ga. 2006).

Additionally, it appears that Mr. Taylor never received a denial letter accurately describing the appeal procedures applicable to his claims, as required by 29 C.F.R. § 2560.503-1(g)(1).  "Employers who wish to rely on the exhaustion of remedies doctrine . . . must comply with applicable ERISA provisions."  Garland v. Gen. Felt Indus., Inc., 777 F. Supp. 948, 951 (N.D. Ga. 1991).  The Claim Denial Letter from Murray erroneously described and attached the procedures set forth in Section 19 of the Plan Document, which apply to non-medical benefits claims, rather than the procedures set forth in Section 18, which govern claims—like the claim here—for medical benefits.  (Doc. 41-2, pp. 4–6; see 41-1, pp. 116–25.)  Section 19's procedures are materially distinguishable from the procedures set forth in Section 18.  For example, under

Section 18, appeals from medical benefits denials may be filed by a participant or their "*authorized* representative" and are reviewed by Anthem BCBS, (doc. 41-1, pp. 116–23 (emphasis added)), whereas, under Section 19, appeals from non-medical benefits denials may be filed by a participant or their "representative" and are reviewed by a "Committee designated by the Board," (id. at pp. 123–25). Additionally, the Denial Letter was produced and sent by Murray on behalf of the Board, despite the fact that Section 18 states that notice of denials of medical benefits will be handled and sent by Anthem BCBS. (Id. at p. 117.) Accordingly, the Court likely has grounds to exercise its discretion to waive the exhaustion requirement. See Bickley, 461 F.3d at 1328 (11th Cir. 2006) ("[A] district court has the sound discretion to excuse the exhaustion requirement . . . where a claimant is denied 'meaningful access' to the administrative review scheme in place.") (internal quotations omitted) (quoting Perrino v. S. Bell Tel. & Tel. Co., 209 F.3d 1309, 1315 (11th Cir. 2000)).

Nonetheless, the Court need not make a determination on the exhaustion issue, because, even assuming UNC Health has met all prerequisites to bringing this suit, the Court's *de novo* review reveals that UNC Health is not entitled to receive benefits under the Plan stemming from Mr. Taylor's injuries. See Discussion Section I.B., infra.

**B.      *De Novo* Review of the Denial of UNC Health's Claims for Benefits**

As noted above, the first step in reviewing a claim to recover denied benefits under Section 502(a)(1)(B) is to review the decision *de novo* to determine whether it is "wrong." Stewart, 43 F.4th at 1254. *De novo* "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Blankenship, 644 F.3d at 1354. "The Court acts as a fact-finder, reviewing the evidence and making a determination on its own as to whether [the claimant] is entitled to . . .

benefits." Smith v. Cox Enters, Inc., 81 F. Supp. 3d 1366, 1379 (N.D. Ga. 2015) (internal quotations omitted).  Indeed, the Court sits "more as an appellate tribunal than as a trial court," and, without taking evidence, "evaluates the reasonableness of [the] administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat. Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (citing Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)).  A decision is "wrong" when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the decision makers' interpretation of the plan. HCA Health Servs. of Ga., Inc. v. Emps. Health Ins. Co., 240 F.3d 982, 994 n.23 (11th Cir. 2001) (collecting cases), *implied overruling on other grounds recognized by* Doyle, 542 F.3d at 1359; see also Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1196 (11th Cir. 2010).

Here, the Board made the decision to deny UNC Health's claims pursuant to the Plan's Crime Exclusion, which excludes from coverage "[i]njuries received while committing a crime." (Doc. 41-1, p. 134; see id. at pp. 287–88; see also doc. 41-2, pp. 1–2.)  The Claim Denial Letter states that, "[b]ased upon the police accident reports," the Board determined that Mr. Taylor received his injuries while driving impaired and fleeing the scene of an accident in violation of N.C. Gen. Stat. § 20-138.1(a) and N.C. Gen. Stat. § 20-166, respectively.  (Doc. 41-2, pp. 1–2.) Thus, to uphold the Board's decision, the record must establish that it is more likely than not that Mr. Taylor's injuries were received while either driving impaired or fleeing the scene of an accident. Waters v. AIG Claims, Inc., No. 2:17-cv-133-RAH, 2022 WL 2252748, at *15 (M.D. Ala. June 22, 2022) (citing Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) ("[I]f the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage.")).

Defendants argue that they are entitled to summary judgment because the police reports show, consistent with the Board's conclusion, that Mr. Taylor received his injuries while driving impaired and fleeing the scene of an accident, as well as committing other crimes, including reckless driving, first degree trespass, and injury to real property.[10]  (See doc. 47, pp. 17–22; doc. 66, pp. 2–6.)  UNC Health argues that summary judgment in its favor is warranted because the record before the Board did *not* establish that Mr. Taylor committed any crimes and, to the extent it did establish that he committed any crimes, the Crime Exclusion is inapplicable because his burn injuries occurred after—not "*while*"—he committed those crimes.  (Doc. 45, pp. 14–17.)

### (1)   Construction of the term "while" contained in the Crime Exclusion

The Parties hotly contest the meaning and scope of the word "while," as it is used in the Crime Exclusion.  According to UNC Health, "while" is "a temporal/durational term, akin to 'during,'" as opposed to a term of causation.   (Doc. 45, pp. 15–17.)  Defendants, on the other hand, contend that the Court should not interpret the term so narrowly.   According to Defendants, Mr. Taylor's crash and resulting injuries clearly occurred because he was fleeing the scene of an accident while impaired, and strictly reading the term "while" to include only injuries received *during* the active commission of a crime would lead to absurd results and render the exclusion meaningless.  (Doc. 47, pp. 20–22.)

Yet, as Defendants acknowledge, courts interpret an ERISA plan according to its plain language.  (Doc. 47, p. 17 ("The focus of this Court's *de novo* review should be the plain language of the Plan.").)  Interpreting contractual provisions "as written is especially appropriate when enforcing an ERISA . . . plan" because focusing on the plan's written terms "is the linchpin

---

[10]   UNC Health argues that Defendants cannot rely on new crimes that the Board did not consider when applying the Crime Exclusion to bar UNC Health's claims.  (Doc. 69, p. 14.)  The Court need not address this argument because it finds that the Board's decision that Mr. Taylor received his injuries while fleeing the scene of an accident was not *de novo* wrong.  See Discussion Section I.B.(2), *infra*.

of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [welfare benefits] plans in the first place." M & G Polymers USA, LLC v. Tackett, 574 U.S. 427, 435 (2015).  Prominent dictionaries define "while" as "during" or with similar terms of duration.  For example, Black's Law Dictionary defines "while" to mean "[p]ending or during the time that."  *While*, Black's Law Dictionary, (6th ed. 1990).  Furthermore, notably, Black's Law Dictionary explicitly states that the term "'[w]hile,' within [a] provision of accidental death life policy excluding coverage for a loss as a result of injury sustained by insured while committing . . . assault or felony, is a word of time and not of causation."  Id. (citing Romero v. Volunteer State Life Ins., 88 Cal. Rptr. 820, 824 (Ct. App. Cal. 1970)).  Merriam Webster defines "while" as "during the time that" and "as long as." *While*, Merriam-Webster's Dictionary.

Defendants do not contest that "while" is routinely defined as a term of duration nor do they cite to a competing definition suggesting that this term means "as a result of."  Rather, Defendants cite to various cases affirming denials of benefits based on exclusions of coverage for injuries received "as a result of" or "resulting from" driving impaired.  (Doc. 66, pp. 7–8 (citing cases).)  However, these cases are inapposite because the exclusions at issue in those cases actually employed those specific phrases and did *not* employ the term "while."  Here, not only does the at-issue exclusion specifically employ the term "while"—rather than "as a result of" or "resulting from"—but, additionally, the Plan, in a separate exclusion, notably employs the specific phrase "as a result of" in addition to the term "while."  Specifically, Section 24 excludes coverage for "[i]njuries incurred *as a result of* a suicide attempt, or intentionally self-inflicted injury *while* sane."  (Doc. 41-1, p. 134 (emphasis added).)  The fact that the drafters of the Plan used both of these terms in a single coverage exclusion—which, like the Crime Exclusion,

applies to specific types of "injuries"— strongly suggests that they (1) intended to use the term "while" instead of "as a result of" in the Crime Exclusion and (2) understood the terms to mean different things.   This conclusion is further bolstered by the fact that the Plan employs causational language in yet another exclusion.   (See id. at p. 130 (excluding from coverage "[a]ny disease or [i]njury *resulting from* a war" and "charges for services directly *related to* military service") (emphases added).)

Defendants cite Sisters of Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust, in which the Seventh Circuit Court of Appeals held that the "best reading" of the term "while" contained in a coverage exclusion for "expenses incurred . . . [w]hile engaged in any illegal or criminal enterprise activity" was "as a result of."  901 F.2d 1369, 1372–73 (7th Cir. 1990).  The plaintiff-hospital in Sisters of the Third Order—similarly to UNC Health in the case at hand—challenged the plan administrator's refusal to pay its claims for the costs of treating a patient who crashed his car while driving impaired.  901 F.2d at 1370.  The Seventh Circuit rejected the hospital's request that it strictly interpret the exclusion and find that the costs of treating the patient were covered because they were not incurred while the patient was driving under the influence.  Id. at 1372.  The Court determined that the drafters must have intended "while" to mean "as a result of" because a literal reading of the term "would drain the exception of meaning, making it ludicrous."  Id. at 1372–73.

Defendants assert that the Court should adopt Sisters of the Third Order's reasoning and depart from the plain meaning of "while" to avoid absurd results that would render the exclusion meaningless.  (Doc. 47, pp. 20–22.)  The Court disagrees.  Here, unlike in Sisters of the Third Order, reading the term "while" literally would not, as Defendants suggest, lead to absurd results or render it meaningless.  The "absurdity" that the Sisters of the Third Order court sought to

avoid by departing from the plain meaning of "while" was generated from the fact that the exclusion at issue there applied to "*expenses incurred*" while engaged in criminal activity.  Id. As the court noted, perhaps the only way that exclusion would apply would be if the plaintiff "had marched into the Medical Center and forced a physician at gunpoint to put a splint on a broken finger."  Id. at 1372.  The Crime Exclusion here, however, is distinguishable because it applies to "*injuries received*" while committing a crime, which is notably broader and conceivably captures a much wider array of maladies.   Indeed, Defendants implicitly acknowledge this by arguing repeatedly that Mr. Taylor received his injuries while engaging in at least five different crimes.  (See doc. 47, p. 18; doc. 66, p. 4 n.4; doc. 62, pp. 13–14.)

Accordingly, based upon the textual evidence that the drafters intentionally used the term "while" instead of "as a result of" (or some other term of causation) and unpersuaded by Sisters of the Third Order, the Court will read "while" as meaning "during" or "during the time that." Therefore, for the Board's decision to be correct, there must be sufficient evidence in the administrative record to find that Taylor received his burn injuries "while" he was committing (i.e., "during" the commission of) the crimes of driving impaired or fleeing the scene of an accident.

> **(2)**    **Whether the administrative record contains sufficient evidence to determine that Mr. Taylor received his injuries while fleeing the scene of an accident in violation of N.C. Gen. Stat. § 20-166(c)**

North Carolina General Statutes § 20-166(c) requires "[t]he driver of any vehicle" who "knows or reasonably should know that the vehicle . . . [he or she] is operating is involved in a crash which results . . . in damage to property" to "immediately stop the vehicle at the scene of the crash."  N.C. Gen. Stat. § 20-166(c).  To prove this offense, "the State must show (i) that Defendant was driving a vehicle, (ii) which was involved in a crash, (iii) that Defendant knew or

reasonably should have known the car was in a crash, (iv) where property was damaged, (v) that Defendant failed to immediately stop at the scene of the crash, and (vi) that Defendant's failure to stop was intentional or willful."  State v. Braswell, 729 S.E.2d 697, 702 (N.C. Ct. App. 2012). "[W]illfulness is an essential element of the offense of hit and run."  State v. Scaturro, 802 S.E.2d 500, 506 (N.C. Ct. App. 2017).  Although the statute does not define "'willful' for purposes of hit and run, [the North Carolina Court of Appeals] has long recognized that 'willful' is defined as the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of law."  Id. (internal quotations omitted).

The record clearly supports a finding that the first five elements are satisfied.  According to Police Report 1, on the night at issue, Mr. Taylor collided with five vehicles while "traveling" west (and in the wrong direction) on Pamalee Drive.  (Doc. 41-1, p. 294.)  The collisions occurred in succession with one another.  (Id.)  Specifically, Mr. Taylor's vehicle ("Unit 1") collided with the first vehicle ("Unit 2"), which was parked on the sidewalk, then hit the second vehicle ("Unit 3") head on, then side-swiped the third ("Unit 4"), then hit the fourth vehicle ("Unit 5") head on, and then side swiped the fifth ("Unit 6").  (Id.)  Taylor reasonably should have known that he was involved in a crash where property was damaged.  Police Report 1 estimates the damage to Mr. Taylor's vehicle at $10,000, the damage to Unit 2 at $3,000, the damage to Unit 3 at $4,000, the damage to Unit 4 at $1,000, the damage to Unit 5 at $7,000, and the damage to Unit 6 at $5,000.  (Id. at pp. 293, 295, 298.)  Furthermore, Units 2, 3, and 5 are listed as not "drivable."  (Id.)  Finally, there is no question that, upon striking Unit 6 (the last collision in the sequence), Mr. Taylor failed to immediately stop at the scene; Police Report 2, which documents Mr. Taylor's crash into the shed, states that Mr. Taylor "had already been

involved in a [six-]vehicle collision," and, "[f]ollowing that collision[,] . . . continued to travel on the roadway."  (Id. at p. 291.)

　　　　While apparently not disputing the first five elements, UNC Health contends that the Board could not rationally have concluded based upon the police reports that Mr. Taylor fled the scene willfully (the sixth element).  (Doc. 60, pp. 25–26.)  According to UNC Health, "the evidence more credibly shows . . . Taylor's vehicle was out of control when it ran off the road and into the shed."  (Id.)  The Court disagrees.  Police Report 1 lists Mr. Taylor's vehicle as a "hit [and] run," (doc. 41-1, p. 293), and explicitly states that Mr. Taylor "*attempted to leave the scene*" after he struck the fifth and final vehicle, (id. at p. 297 (emphasis added)).  Additionally, the police reports belie the conclusion that Mr. Taylor's vehicle was out of control when it left the road and crashed into the shed.  Police Report 2 states that, after the five collisions, Mr. Taylor

> *continued* to travel on [Pamalee Drive] before going left of center and striking a curb.  [Taylor] *continued* off the roadway and then struck a guy wire which damaged the corresponding utility pole.  [Taylor] then *continued* in the back yard of the [private residence] where he collided with the storage shed.

(Id. at p. 291 (emphasis added).)  Furthermore, according to the following diagram in Police Report 1, upon side-swiping Unit 6 (the last car he hit), Mr. Taylor's vehicle was facing west, in the middle of two eastward lanes on Pamalee Drive.



(Doc. 41-1, p. 294 (Taylor's vehicle is the second car from the left).) Crucially, however, a separate diagram (reproduced below) depicting Mr. Taylor's vehicle veering off Pamalee Drive and into the backyard where he struck the shed reveals that Mr. Taylor had, at some point *after* striking Unit 6, made his way into the *westward* lanes of Pamalee Drive and had begun traveling with the flow of traffic. (Id. at p. 262.)



Viewed in conjunction with the statements in the police reports that Mr. Taylor committed a "hit [and] run," "attempted to . . [and] left the scene," "continued to travel on [Pamalee Drive]" after colliding with Vehicle 6, these diagrams strongly suggest that Mr. Taylor was in control of his vehicle and actively fleeing.  In other words, this evidence undercuts UNC Health's suggestion that Mr. Taylor's failure to immediately stop after striking five different vehicles may have been justified or excused, and, thus, not willful, because it indicates that Mr. Taylor remained in control of his vehicle.  Moreover, the police report states that Mr. Taylor's "medical records" showed that, approximately hour after he crashed into the shed, he had a blood alcohol concentration of .18–more than twice the legal limit.  (Id. at p. 291.)  The presence of such a significant amount of alcohol is circumstantial evidence that Taylor purposefully left the scene to avoid being apprehended for driving impaired.  Thus, in light of the forgoing, the police reports more than adequately establish all six elements of fleeing the scene of an accident.

Finally, the evidence shows that Taylor received his injuries *while*—not after— actively fleeing in violation of Section 20-166(c).  It is apparent from the police reports that Mr. Taylor crashed into the shed shortly after striking (without immediately stopping, as required by law) five different vehicles.  Indeed, Police Report 1 strongly suggests that Mr. Taylor's flight from the scene was ongoing when he hit the guy wire and crashed into the shed, and his car burst into flames.  Specifically, it states that "Unit 1 is the at fault vehicle for traveling in the wrong lanes on Pamalee Drive and attempt[ing] to leave the scene.  Unit 1 was involved with another collision *when he left the scene*."  (Doc. 41-1, p. 297 (emphasis added) (citing to Police Report 2, which documents Taylor's collision with the guy wire and storage shed).)  Thus, the police reports show that, more likely than not, Mr. Taylor received his injuries while he was fleeing the scene of the six-car collision for which he was at fault.

Finally, to the extent that UNC Health contends that the Board's decision was *de novo* wrong because police reports are inadmissible hearsay, this argument fails. (See doc. 60, p. 24 n. 12; see doc. 1, ¶ 27.)  Courts routinely analyze reports produced by government officials that were relied upon by the decision maker when deciding whether an adverse benefits decision was *de novo* wrong.  See Zieglar v. Reliance Standard Life Ins. Co., No. 6:06-cv-1176-Orl-28UAM, 2007 WL 9701531, at *6 (M.D. Fla. Oct. 29, 2007) (agreeing with the administrator's denial of claim for accidental death benefits based upon the "Florida Highway Patrol traffic homicide investigation report and blood alcohol test results"); see also Waters, 2022 WL 2252748, at *16 (collecting cases).  Additionally, the fact that the police reports may contain inadmissible hearsay is irrelevant, since the Court may consider any evidence "available to the plan administrator" and is not constrained by the Federal Rules of Evidence.  Herman v. Hartford Life & Accident Ins. Co., 508 F. App'x 923, 928 (11th Cir. 2013) (citing Black v. Long Term Disability Ins., 582 F.3d 738, 746 n.3 (7th Cir. 2009) ("The Federal Rules of Evidence, however, do not apply to an ERISA administrator's benefits determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator.")).

Based on the forgoing, the Court agrees with the Board's decision that UNC Health's claim falls within the Crime Exclusion because Mr. Taylor received his injuries while fleeing the scene of an accident.[11]  The Board's decision was not *de novo* wrong, and, accordingly, must be

---

[11]  To the extent that UNC Health seeks summary judgment on its request in Count I for a declaration that the claims "were covered under the Plan," this request is denied for all the reasons stated within this section (Discussion Section I.B).  (Doc. 1, p. 24; see id. at p. 28 (praying for a "declaratory judgment that . . . Taylor's hospitalization, care, and treatment at UNC Hospitals were covered under the terms of the Plan").)  Such a declaration would be akin to declaring that the benefits UNC Health seeks to recover are "due to him under the terms of" the Plan for purposes of Section 502(a)(1)(B) and, thus, that the Board's denial was *de novo* wrong.

Additionally, the Court need not address UNC Health's "full and fair review" claim asserted in Count III and its similar request in Count I for a declaration that its appeal is "deemed denied without the exercise

affirmed.  <u>Blankenship</u>, 644 F.3d at 1355 (instructing courts to end the inquiry and affirm the administrator's decision if it was not "*de novo* wrong").

## II.      Attorneys' Fees and Costs

In Count IV, UNC Health requests attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) ("Section 502(g)").  (Doc. 1, pp. 27–28.)   Defendants seek summary judgment denying this request.  (Doc. 47, p. 24, n. 14; doc. 44, pp. 12–16.)  Section 502(g) authorizes a court to allow "reasonable attorney's fee and costs" in any action brought by a participant, beneficiary, or fiduciary *under Section 502*.  29 U.S.C. § 1132(g).  Counts I and II are brought under Section 502, whereas Count III is brought pursuant to 29 U.S.C § 1133 ("Section 503").  (<u>See</u> doc. 1, pp. 23–27.)  Thus, although fees could be available for Counts I and II, the Court lacks discretion to grant fees for Count III.

Before a court can award fees under Section 502(g), the claimant must show that it obtained "some degree of success on the merits."  <u>Hardt v. Reliance Stand. Life Ins. Co.</u>, 176 L.Ed.2d 998 (2010).  UNC Health cannot make this showing.  The Court reviewed *de novo* the Board's decision to deny UNC Health's claim and affirmed the decision because Mr. Taylor's

---

of discretion by Anthem BCBS."  (<u>See</u> doc. 1, pp. 23–27.)  Both Counts I and III allege that the Board's decision is "deemed denied without the exercise of discretion by Anthem BCBS" because Anthem BCBS allegedly failed to provide a "full and fair review" of the Board's decision as required by 29 U.S.C. § 1133(2) and 29 CFR 2560.503-1(h)(2).  (<u>Id.</u>)  UNC Health concedes that it did not seek damages on these "full and fair review" claims but rather, asserted them in an effort to obtain either *de novo* review of the Board's decision or a finding that UNC Health exhausted its internal remedies.  (Doc. 60, p. 18.)  (Furthermore, it is clear from UNC Health's briefing that the reason it sought a declaration that its appeal is "deemed denied" is to obtain *de novo* review.  (<u>See</u> doc. 45, p. 18 ("Defendants forfeited deferential review because the claims are deemed denied without the exercise of discretion.").)  In light of the fact that the Court has applied *de novo* review (and affirmed the Board's decision), there is no reason for the Court to wade into the issues presented in Counts I and III (i.e., no pending request therein for some yet-to-be-addressed type of relief), and the Court thus deems those counts moot and declines to specifically address them.  Accordingly, the Court also need not delve into the following arguments raised by Defendants with respect to those claims: (1) that UNC Health lacked "statutory standing" or a private right of action to assert its "full and fair review" claim (or, more generally, to challenge Anthem BCBS's compliance with ERISA regulations), (<u>see</u> doc. 47, pp. 14–15), or (2) that Anthem BCBS's substantial compliance with ERISA's procedural regulations warrants arbitrary and capricious review of the decision to deny UNC Health's claims, (<u>see</u> doc. 62, pp. 25–30; doc. 44, pp. 10–11, n. 3).

injuries fell within the Crime Exclusion, and, thus, were not covered by the Plan.  See Discussion Section I.B, supra.  Based on this finding, UNC Health is not entitled to a declaration that its claims were covered under the Plan nor is it entitled to receive benefits under the Plan as alleged in Counts I and II, respectively.  Additionally, the Court did not address the remaining allegations in Count I concerning the alleged mishandling of UNC Health's appeal.  See Vivas v. Hartford Life & Acc. Ins. Co., No. 10-22992-CIV, 2013 WL 5226720, at *3 (S.D. Fla. June 17, 2013), *report and recommendation adopted*, No. 10-22992-CIV, 2013 WL 5226506 (S.D. Fla. Aug. 27, 2013) (finding that a plaintiff does not achieve any success on the merits of a claim that the court does not address); see note 11, supra (explaining that Count I is moot, and, therefore, declining to address it).  Thus, UNC Health did not achieve success on the merits of Counts I or II, and the Court, therefore, lacks discretion to award fees for the claims alleged therein. Accordingly, Defendants are entitled to summary judgment on UNC Health's claim for attorneys' fees in Count IV.

## CONCLUSION

Based on the forgoing, the Court **GRANTS in part and DENIES as moot in part** Defendant ITPEU Health and Welfare Plan, Defendant ITPEU Health and Welfare Fund, and Defendant Board of Trustees of the ITPEU Health and Welfare Fund's Motion for Judgment on the Administrative Record and for Summary Judgment, (doc. 47), and Defendant Anthem Insurance Companies, Inc. and Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc.'s Motion for Summary Judgment, (doc. 44).  Specifically, the Court **GRANTS** Defendants' Motions with respect to Counts II and IV of the Verified Complaint and **DENIES** Defendants' Motions **as moot** with respect to Counts I and III.  (Docs. 44, 47.)  Additionally, the Court **DENIES** Plaintiff University of North Carolina Health Care System's Motion for

Judgment on the Administrative Record, (doc. 45), and its request for oral argument, (doc. 70).

Accordingly, UNC Health's claims set forth in the Verified Complaint are **DISMISSED**.

      **SO ORDERED**, this 29th day of September, 2022.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA